## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MELVIN HERNANDEZ, #350-236     *
    Plaintiff,

                         *

      v.                      CIVIL ACTION NO. DKC-14-1562

                         *

PATRICIA VALE, Regional Executive
   Director, Department of Public Safety and     *
   Correctional Services,
JOHN WOLFE, Warden (JCI),              *
CHERIE PEAY, Ass't. Warden (JCI),
JOHN DOE, JCI Case Management Team,     *

      Defendants.                *

                     ******

## MEMORANDUM OPINION

This complaint is brought pursuant to 42 U.S.C. § 1983 by self-represented Plaintiff Melvin Hernandez ("Hernandez"), who is an inmate at Western Correctional Institution ("WCI").  (ECF No. 1).  Defendants Patricia Vale, Regional Executive Director, John Wolfe, Warden and Cherie Peay, Assistant Warden,[1] by their counsel have filed a Motion to Dismiss or, in the Alternative for Summary Judgment (ECF No. 13).[2]  Hernandez has filed an opposition. (ECF No. 15).[3]

---

[1]      Service was not obtained on "John Doe, JCI Management Team."

[2]      Defendants' dispositive submission will be treated as a Motion for Summary Judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered.  *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

[3]      Consonant with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Clerk notified Hernandez that he was entitled to file an opposition with materials in support.  (ECF No. 14).

The case is ripe for disposition.[4]  After considering the pleadings, exhibits, and applicable law, the court now rules pursuant to Local Rule 105.6 (D. Md. 2014), as a hearing is unnecessary.

## BACKGROUND

Hernandez claims that during the time he was an inmate at the Jessup Correctional Institution ("JCI"), Defendants violated his constitutional rights by exhibiting deliberate indifference to his mental and physical welfare.  Specifically, he alleges:  1) he was not provided a Spanish-speaking interpreter at his classification reviews; 2) he had been on administrative segregation for approximately twenty months pending a transfer to another institution; and 3) the conditions to which he was subjected in administrative segregation were inhumane and deleterious to his physical and mental health.  (ECF No. 1).  He is seeking injunctive relief and damages.

Defendants' dispositive paper raises defenses of failure to exhaust administrative remedies, respondeat superior, and qualified immunity.  Further, Defendants maintain they are entitled to Eleventh Amendment immunity with respect to Hernandez's claims against them in their official capacities.  Additionally, they assert the facts do not support Hernandez's claim that they acted with deliberate indifference to his physical and mental well-being.  Defendants aver Hernandez was placed on administrative segregation for his own safety and his transfer to another institution was not unduly delayed.  Defendants maintain the conditions of Hernandez's administrative segregation housing were not inhumane, and he was provided regular and timely

---

[4]        On March 4, 2015, Hernandez filed a Motion to Withdraw this case, which was granted on March 4, 2015.  (ECF Nos. 18, 19).  On June 25, 2015, Hernandez filed correspondence requesting rescission of the Order granting voluntary dismissal of this case.  (ECF No. 21).  Hernandez claimed he had neither filed the Motion to Withdraw the Complaint nor did he authorize anyone to do so on his behalf.  (ECF No. 21).  Defendants did not oppose the request.  As this case was ripe for adjudication at the time the Motion to Withdraw was received and neither party was prejudiced by its reopening, Plaintiff's request to rescind the Order dismissing this case was granted. (ECF No. 22).

treatment for his physical and mental health issues.  Defendants also indicate Hernandez was provided the services of a translator. (ECF 13).

## I.    Plaintiff's Allegations

Hernandez has filed his affidavit with his complaint. (ECF No. 1-1).  In it, he attests he is Hispanic and does not speak English. (ECF No. 1-1, p. 2).[5]  Hernandez attests that during monthly administrative reviews, he was unable to understand the review procedure or "articulate a defense."  *Id*.  "Only on one occasion I was afforded a bilingual officer, Sgt. Roman, who helped me understand the proceeding."  *Id*.  Hernandez states Sgt. Roman "translated what was being told to me by the Team, that I was 'being transferred to another facility.'"  *Id*.  Nonetheless, he claims he was denied a transfer to another prison by Defendants without any penological reason or interest after he was be placed in solitary confinement from in November of 2012.  *Id*.[6]

Hernandez attests that during his twenty months on administrative segregation, he developed a skin infection, causing severe burning on his face and back.  He claims the medicine prescribed for him did not relieve his pain or ameliorate the rash.[7]  He also claims he was unable to sleep and developed severe headaches, paranoia, depression, and anxiety.  *Id.*

Hernandez claims that prior to his assignment to disciplinary segregation on September 25, 2012, following an "incident" and subsequent placement on administrative segregation, he had no history of mental illness. (ECF No. 1, pp. 3-4).  Hernandez indicates that after the assignment to segregation housing the institutional psychiatrist prescribed a mild

---

[5]     Page citations are to the electronic record.

[6]     There is no evidence that Hernandez was denied a transfer.

[7]     The Complaint does not name medical providers as defendants.

psychotropic medication which failed to relieve his anxiety, attacks, paranoia, and depression. *Id*.

Hernandez attests he presented these concerns to Defendants with the assistance of his fellow prisoners.  *Id*. at 4-5; *see also* ECF No. 13-3, pp. 23, 25, 26.  He complained to Defendants Wolfe and Vale about receiving "sham" monthly Security Classification Reviews and the failure to provide evidence to substantiate the reasons for his continuing assignment on administrative segregation and exposure to inhuman conditions of confinement.  *Id*. at 6.  He complained to Defendant Peay of discrimination and unjustified and unreasonable segregated confinement.  *Id*.  He asked Peay to consider releasing him from administrative segregation based on the deterioration of his physical and mental health.  *Id*.  Additionally, he complained to Defendant Vale about his deteriorating physical and mental health, his loss of industrial credits, and his inability to access benefits accorded to prisoners in general population.  *Id*.

Based on these allegations, Hernandez asserts Defendants acted with deliberate indifference to his mental and physical well-being by unreasonably delaying his transfer to another correctional facility.  *Id*.  Hernandez, who is suing Defendants in their official and personal capacities, seeks damages as redress.  *Id*. [8]

## II.    Defendants' Response

Defendants' response is supported with verified exhibits, including prison and medical records and a declarations executed by Defendant Peay, Michael Yates, Assistant Litigation Coordinator at WCI, and Scott Oakley, Executive Director of the Inmate Grievance Office.

---

[8]       Hernandez also sought injunctive relief requiring Defendants to provide cause for his ongoing placement on administrative segregation, his release from "solitary confinement" and transfer to a "lateral" institution.  (ECF No. 1).  In light of his transfer to WCI on May 13, 2014 (ECF No. 13-2, p. 4), his requests for injunctive relief are moot.  *See e.g. Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (same); *Magee v. Waters*, 810 F.2d 451, 452 (4th Cir. 1987) (same).

(ECF Nos. 13-2, 13-3).

### A.        Segregation Housing Records

Defendant Peay's declaration and verified prison records demonstrate that on August 26, 2012, Hernandez and another inmate Edgar Garcia-Zarala engaged in an assault on inmate Vincent Cameron Brown using a weapon.  Peay attests that Garcia-Zarala is a member of a known Security Threat Group ("STG"), and Brown is a member of a different STG.  (ECF Nos. 13-2; 13-3 pp. 5-13).  Brown was added to Hernandez's "enemies list" following the altercation. (ECF No. 13-1, p. 2).

Hernandez subsequently pleaded guilty to violating institutional rule violation # 102 (assault or battery on an inmate) and was sanctioned on October 22, 2012, to 60 days of disciplinary segregation.  (ECF No. 13-3, p. 9).

### B.        Administrative Segregation Housing Records

Hernandez was placed on administrative segregation for his safety after he was attacked by Brown in November of 2012.  (ECF 13-2, p. 2).

On December 4, 2012, with the assistance of Sgt. David Roman, a Spanish speaking correctional officer, Lt. Ronel Legrand interviewed Hernandez.  Hernandez stated that he did not fear for his safety and wanted to return to the general prison population.  *Id.*; *see also* ECF No. 13-3, pp. 23, 35-36; 48.

Defendant Peay attests that December 7, 2012, Legrand interviewed an inmate who is a high ranking member of Brown's STG regarding the assault on Brown.  The STG ranking member stated he did not have a problem with Hernandez.  He stated, however, that he could not speak for anyone else from his organization.  The STG ranking member stated that he did not want to be held accountable for Hernandez if he was involved in any incident.  *Id.* at 2-3.

Additional investigation by Legrand revealed information from confidential informants and institutional officers that a "hit" had been placed on Hernandez by Brown's STG. *Id.*

Based on this information, Legrand substantiated a threat against Hernandez and recommended placing him on administrative segregation pending transfer to the general population at another institution. *Id.* at 3, 6; ECF No. 13-3, p. 18-34; 47.

Legrand attended Hernandez's review board meetings with the case management team. (ECF No. 13-2, pp. 6-7, 8). On a few occasions, he asked that Sgt. Roman attend the review to translate for Hernandez. *Id.* Legrand indicates Hernandez "never requested a translator during any segregation reviews." (ECF No. 13-2, p. 7). Legrand recalled that during one segregation review team meeting, Hernandez submitted a report to case manager George Allen requesting to be returned to the general population. *Id.* A copy of the request was placed in his file. *Id. see also* ECF No. 13-3, p. 3.

George Allen, a JCI case manager, does not recall whether Hernandez requested an interpreter at his 30 day administrative segregation reviews, although he recalled that Sgt. Roman acted as an interpreter on several occasions during Hernandez' reviews. (ECF No. 13-2, p. 2). Allen also stated, "in the beginning, inmate Hernandez did not have a communication problem with the team." *Id.*

On January 30, 2014, Allen submitted a memorandum to Mrs. S. Henson-Smith, the Director of Case Management, in which he indicated Hernandez had submitted a request for transfer to another institution. (ECF No. 13-3, p. 19). The memorandum reads that per Lt. Legrand, Hernandez "cannot be safely house here at JCI. He is currently awaiting transfer to another facility general population. An inmate statement has also been submitted by the inmate requesting transfer along with a report from Lt. Legrand." *Id.*

In accordance with Legrand's investigation and recommendations, Hernandez was placed on administrative segregation and scheduled for transfer to another correctional institution. Hernandez's case was reviewed monthly.  The monthly reports did not demonstrate any change of circumstance to lessen concern for his safety, and Hernandez remained on administrative segregation.  (ECF No. 13-2, pp. 4-4; ECF No. 13-3, pp. 14-18, 20-22, 27-32, 37-45, 59).

In her declaration Assistant Warden Peay attests "[d]ue to the limitations of appropriate space in Maryland correctional facilities, there was difficulty in getting inmate Hernandez transferred as a medium security inmate.  There was no intentional delay with respect to transferring Hernandez, and on May 13, 2014, he was transferred to Western Correctional Institution ("WCI").  (ECF No. 13-2, p. 4).  Peay declares Hernandez was never placed in "'solitary confinement.'"  *Id.*[9]  She attests "JCI does not have solitary confinement cells."  *Id.*

### C.    Hernandez's Letters

Hernandez wrote to Peay in a letter dated January 14, 2014.  ECF NO. 13-3, p. 26.  In the letter Hernandez states he has been on administrative segregation for more than one year and alleges he has been denied the opportunity to return to the general population because he cannot speak English.  *Id.* He stated that with Sgt. Roman's assistance, he "told the case manager to transfer me out the jail [sic] if I am not release [sic] from segregation.  The case manager told me he put me in for a transfer in January of 2013."  *Id.*  Hernandez added that he feels "discriminated" because he has been denied "the equal opportunity" to earn good conduct credit by working in a prison job, a double cell placement, educational programming, and recreation opportunities.  *Id.*  Hernandez also asserted, "I am becoming antisocial.  Being unable to

---

[9]    Defendants state that administrative segregation "does not involve solitary confinement, even though an inmate may not have a cell mate on occasion." (ECF No. 1, p. 17).

communicate with other people, like people from the general population do, I feel that it is causing my mental health condition to deteriorate over the passage of segregation time." *Id.*

On January 30, 2014, Hernandez sent a letter to Peay titled "Consideration for Release from Administration [sic] Segregation/or as an Alternative for Transfer to another Institution within Md. Dep't of Public Safety and Correctional Services." (ECF No. 13-3, p. 25). The letter reads in part:

> I'm expressing the need of trying to resolve my continue [sic] placement on the above status after serving a segregation sentence of two months for a rule violation 102, such sentence had expired in November 26, 2013. The case management team(s) has [sic] constantly noted no changed [sic], as well as well never recommended no other alternatives to be consider [sic] by you or the Warden. Thus not having the opportunity(s) as those that has [sic] been released from said Administrative Segregation after their segregation had expired, that its [sic] my concern the need to be address because I'm unable to actually speak English and difficult to defend myself, where as [sic] Sgt. Roman had to translate for me at one of the Case Management Team hearings when members questioned me. That given the actual social impact that health care provider has [sic] documented the effects of long-term segregation has on one mental state, and not the opportunity to earn credits, or participate in any of the programs within the prison system, as well group recreation activitives [sic] in the general population that will assist in my rehabilitation with others in the general population to avoid becoming anti-social toward others.

*Id*.

In an inmate statement dated February 4, 2014, Hernandez wrote that he did not fear for his life and asked to be removed from "PC" status. (ECF No. 13-3, p. 3). Hernandez wrote, "If I can't be placed in population at JCI, I would like to be placed in population at another institution." *Id.* The inmate statement was witnessed by Sgt. Roman. *Id.* An e-mail sent the same day, February 4, 2014, by case manager Olusola Ayoodugesan to Lt. Legrand reads, "[t]he inmate gave me a statement today, requesting GP [general population] at any other institution. Available information indicated that he was recommended for PC [protective custody]

housing."[10]  (ECF No. 13-3, p. 24).  Legrand replied Hernandez "isn't safe at JCI however if he

wants gp [general population] at another institution that's fine."  *Id.*

### D.    Medical Records

Hernandez was examined after the August 26, 2012 altercation. (ECF No. 13-4, p. 9).  On

September 10, 2012, he was seen by a medical provider for a rash that started two weeks earlier.

*Id.* at 10*.*  A report dated November 6, 2012, states that the prescribed medicine for the rash was

not effective.  *Id*. at 12.  A November 28, 2012 report states that the prescribed medicine

Acyclovir was effective for treating the rash.  *Id*. at 14.  Hernandez's medical record dated

November 15, 2012, shows he was seen for a toe nail problem.  *Id*. at 16.

Hernandez submitted a handwritten letter asking for psychological help on December 11,

2012.  *Id*. at 107.  Jacqueline Moore, Chief of Psychology at JCI, indicates in a Memorandum

dated September 4, 2014, that Hernandez was initially seen by a mental health provider on

December 11, 2012, when he reported anxiety concerns of fear and problems sleeping.  (ECF

No. 13-2, p. 11).  Hernandez was seen again on December 13, 2012 when he reported feeling

---

[10]      Hernandez's case management assignment sheets from his monthly reviews on March 15, 2013 and April 15, 2013, recommended he remain on administrative segregation pending transfer and assignment to the general population at another institution.  *Id*. at 42, 42.  These reviews reflected Legrand's recommendation that Hernandez stay in administrative segregation until he was transferred to the general population at another facility. *Id*. at 46-47.  Case management assignment reviews dated May 13, 2013, June 14, 2013, July 16, 2013, August 12, 2013, September 10, 2013, October 2, 2013, and November 6, 2013, changed the recommendation to keep Hernandez on administrative segregation pending transfer and assignment to protective custody.  *Id*. at 30-32, 37-40. The report noted administrative segregation pending transfer was for the inmate's safety." *Id*.

On December 4, 2013, the case management team returned to its original recommendation to maintain Hernandez on administrative segregation until his transfer to another facility's general population.  *Id*. at 29.  The December 4, 2013, report indicated the recommendation was for the inmate's safety and per Lt. Legrand's report. *Id*.  Handwritten changes on the report deleting the recommendation for administrative segregation pending transfer to protective custody and adding instead until transfer to the general prison population at another facility were initialed by case manager George Allen. *Id*.

Case assignment reviews issued thereafter recommended administrative segregation housing pending Hernandez's transfer to another facility's general population "for the inmate's safety."  *Id*. at 18, 20-22, 28.  It is not clear why the case management team changed the recommendation.

depressed since his incarceration.  *Id*.  Hernandez was prescribed medication for anxiety and depression, and followed by JCI mental health providers until his transfer.  *Id*.

A December 17, 2012 report indicates Hernandez missed a psychiatric appointment.  *Id*. at 17.  The appointment was rescheduled with a Spanish interpreter.  *Id*.  Defendants note this report is the first time there is a suggestion of any mental health issues in Hernandez's records. (ECF No. 13, p. 8).  Hernandez's records dated thereafter, relate to the ongoing rash and indicate chronic depressive disorder.  (ECF No. 13-4, pp. 18-66).  The records all report Hernandez was in no apparent distress.  *Id*.  Hernandez's May 12, 2014 transfer papers between JCI and WCI show he will receive a behavioral health referral due to his history of depressive disorder.  *Id*. at 63-64.

LaShauna Grier, Health Services Administrator of the JCI Medical Department states in a memorandum submitted by Defendants that Hernandez was assessed and treated in the JCI Medical Department at least once a month since November of 2012. (ECF No. 13-2, pp. 4, 10).

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id*. at 249.

In this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).  If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted.  *Anderson*, 477 U.S. at 249–50.  On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citations omitted).

## DISCUSSION

Defendants assert several grounds in support of their dispositive motion, including Hernandez's failure to exhaust administrative remedies, respondeat superior, Eleventh Amendment immunity, and qualified immunity.  Defendants also maintain the facts do not demonstrate they acted with deliberate indifference to Hernandez's physical and mental well-being.

## I.      Exhaustion of Administrative Remedies

Defendants assert Hernandez has failed to exhaust his administrative remedies, as is required under The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, et. seq., which states, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  The purpose of exhaustion is to:  1) allow a prison to address complaints about the program it administers before being subjected to suit; 2) reduce litigation to the extent complaints are satisfactorily resolved; and 3) prepare a useful record in the event of litigation. *Blake v. Ross*, 787 F.3d 693, 697-8 (4th Cir. 2015), citing *Jones v. Bock*, 549 U.S. 199, 219 (2007).  "To serve these ends, the [Supreme] Court has interpreted the requirement quite strictly to require "proper exhaustion."  *Blake v. Ross*, 787 F.3d 698, citing *Woodford v. Ngo*, 548 U.S.81, 93 (2006).  A prisoner must proceed through the administrative process even he seeks some relief that the process has no power to afford.  *See Booth v. Churner*, 532 U.S. 731, 740–41 (2001).

The exhaustion requirement "has been interpreted to require prisoners to pursue administrative grievances until they receive a final denial of their claim, appealing through all available stages in the administrative process."  *Chase v. Peay*, 286 F.Supp.2d 523, 530 (D. Md. 2003).  If the appeal is unsuccessful, the prisoner must, within thirty days, file an appeal with the Executive Director of the Inmate Grievance Office ("IGO").  *Id.* [11]

The exhaustion requirement does not, however, require the exhaustion of administrative processes unavailable to a prisoner.  "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."

---

[11]    Filing a request for administrative remedy with the Warden of the Maryland prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure process provided by the Division of Correction ("DOC") to its prisoners.  If the Warden's decision is not satisfactory to the inmate, the prisoner has ten calendar days to file an appeal with the Commissioner of DOC.  COMAR 12.07.01.04B.  If the appeal is denied, the prisoner has thirty days in which to file an appeal to the Inmate Grievance Office.  *See* COMAR 12.07.01.03; 12.07.01.05.B; see also C.S. § 10–206.  Complaints are reviewed preliminarily by the IGO.  *See* C.S. § 10–207; COMAR 12.07.01.06.  If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10–207(b)(1); *see* COMAR 12.07.01.06B(6).  The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10–207(b)(2)(ii).  However, if a hearing is deemed necessary by the IGO, the matter is transmitted for a hearing to be conducted by an administrative law judge with the Maryland Office of Administrative Hearings.  *See* C.J. § 10–208(c); COMAR 12.07.01.03B(8); 12.07.01.07A.  The conduct of such hearings is governed by statute. C.S. § 10–208.

*Blake v. Ross*,  787 F.3d at 697 (quoting *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008)).

This court is "obligated to ensure that any defects in administrative exhaustion were not procured

from the action or inaction of prison officials." *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223,

1225 (10th Cir. 2007).  The United States Court of Appeals for Fourth Circuit has addressed the

meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner,
> through no fault of his own, was prevented from availing himself of it.  *See id.*  478
> F.3d at 1225; *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  Conversely, a
> prisoner does not exhaust all available remedies simply by failing to follow the
> required steps so that remedies that once were available to him no longer are.  *See
> Woodford v. Ngo*, 548 U.S. 81, 89 (2006).  Rather, to be entitled to bring suit in
> federal court, a prisoner must have utilized all available remedies in accordance with
> the applicable procedural rules, so that prison officials have been given an
> opportunity to address the claims administratively.  *Id.* at 87.  Having done that, a
> prisoner has exhausted his available remedies, even if prison employees do not
> respond.  *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F.3d at 725; *see also Blake v. Ross*, 787 F.3d at 700–01 (inmate's belief

that he exhausted administrative remedies was a reasonable interpretation of investigative and

grievance procedures).  Because an inmate's failure to exhaust administrative remedies is an

affirmative defense, Defendants bear the burden of proving that Hernandez had available

remedies of which he failed to take advantage.  *Id.*

Hernandez filed Administrative Remedy Request ("ARP") JCI-0428-14 on April 16,

2014, complaining about the fact and length of his assignment to administrative segregation, his

"sham" monthly security classification reviews, and the conditions of his confinement.  (ECF

No. 13-2, pp. 18-22).  Regarding the conditions of his confinement, Hernandez complained about

non-contact visitation, one hour indoor out-of-cell daily activity, denial of environmental stimuli,

two showers per week, and limited access to the law library.  *Id.*

On April 23, 2014, the Institutional ARP Administrator dismissed the ARP for procedural reasons. *Id.* at 18. The ARP response read: "Dismissed for procedural reasons: Final per DCD 185-002 VI.B.1. Inmates may not seek relief through the Administrative Remedy Procedure regarding Case Management." *Id.*[12] Hernandez did not appeal the dismissal.

Defendants assert Hernandez failed to exhaust his administrative remedies because he did not appeal the decision through the administrative process. Scott S. Oakley, Executive Director of the Inmate Grievance Office ("IGO"), attests in his declaration that Hernandez did not file a grievance relating to this matter. (ECF No. 13-5).

Hernandez counters that he has exhausted his administrative remedies. (ECF No. 1, p. 5). He argues that on January 14, 2014 and January 30, 2014, he wrote "informal complaints" to resolve his concerns about his segregation confinement. *Id.* Moreover, Hernandez maintains that because dismissal of his ARP was a "final" disposition under DCD 185-002, the matter could not be further appealed. *Id.*[13]

Defendants do not address whether Hernandez's interpretation the procedural dismissal of the ARP request was "final" and no longer available to him was reasonable under the circumstances. Thus, when viewing the facts in the light most favorable to Hernandez, the non-movant, and drawing all reasonable inferences in his favor, as this court must do when deciding a motion for summary judgment, Defendants have not met their burden to prove that Hernandez had remedies available to him of which he failed to take advantage. Summary judgment will not be entered on the basis of failure to exhaust administrative remedies.

---

[12]     Insofar as Hernandez complained about the conditions of confinement in the ARP, it is unclear why his concerns were dismissed as a case management decision.

[13]     Neither party has provided a copy of DCD 185-002.

## II.     Respondeat Superior

In order for liability to exist under § 1983, there must be personal involvement by the Defendant in the alleged violation.  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *see also Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976).  Vicarious liability based on respondeat superior is generally inapplicable to § 1983 actions.

Hernandez does not allege Defendants personally participated in the matters alleged. Instead, he claims that he complained to Defendant Peay of being discriminated against and about his unjustified and unreasonable segregated confinement.  He claims that he complained to Defendant Wolfe about "sham" monthly security classification reviews, the conditions of his confinement, and continued placement on administrative segregation. (ECF No. 1).  He claims that he complained to Defendant Vale about his physical and mental health, loss of industrial credits, and inability to receive benefits in the general prison population as a result of the "sham" segregation review team.  *Id.*

To the extent Hernandez seeks to hold Defendants liable in their supervisory capacities, principles of supervisory liability require demonstration that:  (1) the supervisor's actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw*, 13 F.3d at 799.  As Hernandez does not allege facts to satisfy these requirements, there are no grounds to hold Defendants liable based on supervisory liability.  Thus, Defendants

are entitled to summary judgment as a matter of law.  Further, for reasons to follow, even if this argument were unavailing, summary judgment in favor of Defendants is appropriate on other grounds as well.

### III.     Eleventh Amendment Immunity

Hernandez brings his claims against the Defendants in their official and personal capacities.  The Eleventh Amendment bars suit in federal court, absent consent, against a state by its own citizens.  *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001).  Under the Eleventh Amendment to the United States Constitution, a state, or one of its agencies or departments, is immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents.  *See Pennhurst State School and Hospital v Halderman*, 465 U.S. 89, 100 (1984).  While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Ann. Code, State Gov't. Art., § 12–201(a) (2014 West), it has not waived its immunity under the Eleventh Amendment to suit in federal court.  Thus, Hernandez's claims against Defendants in their official capacities is barred by Eleventh Amendment immunity.  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  Accordingly, Defendants are entitled to summary judgment as to the claims against them in their official capacities.

### IV.     Conditions of Confinement

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *see also Makdessi v. Fields*, _ F.3d __, __, 2015 WL 1062747, at *5 (4th Cir. Mar. 12, 2015) (observing the Eighth

Amendment imposes duties on prison officials to provide humane conditions of confinement). Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions which are merely "restrictive or even harsh ... are part of the penalty that criminal offenders pay for their offenses against society." *Id.* It is not the province of this court to determine how a prison might be more beneficently operated; the expertise of prison officials must be given due deference. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995). This deference is at its greatest when prison order is at stake. *See In Re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (2003). "The Constitution ... 'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (citations omitted).

In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements-that the deprivation of [a] basic human need was objectively sufficiently serious, and that subjectively the officials acted with a sufficiently culpable state of mind. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). Only extreme deprivations can be characterized as punishment prohibited by the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 8–9, (1992). An extreme deprivation is one "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner

must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Hernandez claims Defendants knew or should have known of his mental and physical health concerns as early as December 2012.  (ECF No. 1,  p. 5  ¶23).  He also claims Defendants unreasonably delayed his transfer to another facility with deliberate indifference to his civil rights, directly resulting in mental illness and physical injuries to his skin.  *Id*. at ¶¶26-27. Hernandez also claims he was held in solitary confinement, which was inhumane and caused him to endure an ongoing skin infection and mental health problems.  *Id*. at ¶¶ 28-29.

Hernandez was placed on administrative segregation between October 2012 and May 12, 2014, after it was determined that he was in danger of harm from a known enemy, with whom he had twice engaged in physical attacks, and the STG to which this enemy belonged.  An investigation was conducted by Lt. Legrand, an institutional intelligence officer, who concluded that Hernandez was not safe at JCI.  Legrand recommended Hernandez's placement on administrative segregation until he could be transferred to another institution.  The records show Hernandez's circumstances were reviewed monthly by a case management committee.  Legrand attended Hernandez's review board meetings with the case management team.  Lt. Peay attests there was difficulty getting Hernandez transferred as a medium security inmate, and denies there was intentional delay with respect to effectuating the transfer.

The record shows Hernandez first raised his concerns to prison officials in letters in January of 2014.  Hernandez does not explain why Defendants should have been aware of his claims, in December of 2012 as he claims.  He submitted his first and only ARP about his concerns on April 16, 2014.  During his time in administrative segregation, he received monthly

case management reviews and was continued in administrative status for his safety until a transfer could be arranged to an appropriate medium security facility.

Notably, Hernandez does not particularize what conditions on his administrative segregation caused him a skin rash and depressive disorder.[14]  His medical records do not suggest a nexus between his placement in administrative segregation and these conditions.  In fact, his medical records show the rash began prior two weeks prior to his placement on disciplinary segregation, more than two months before he was assigned to administrative segregation.  Verified exhibits demonstrate Hernandez was provided medical care and mental health treatment for his reported conditions.[15]  Assistant Warden Peay attests he was not kept in an isolation cell.[16]   In May of 2014, Hernandez was transferred to another correctional institution.  After it was made known to the case management team that Hernandez did not fully understand his case management review proceedings, an interpreter was requested.

Under these circumstances, there is insufficient evidence to show Defendants acted with requisite deliberate indifference to Hernandez's physical and mental health well-being or that he was subjected to conditions so inhumane that he was denied the minimal civilized measures of

---

[14]     Even if the court assumes Hernandez is unable to articulate his complaints due to his lack of English, he has stated that he was able to obtain assistance from his fellow prisoners.  *See e.g.* ECF No. 1, pp 4-5, ECF No. 15-1, p. 7.  His complaint and pleadings in this court are coherent and adequately outline his concerns.

[15]     Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  As nonmedical correctional supervisors, Defendants are entitled to rely on the medical judgment and expertise of prison medical and mental health providers concerning the course of treatment necessary for an inmate.  *See Shakka*, 71 F.3d at 167; *Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th Cir. 1990) (stating supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with an inmate's medical treatment ordered by such personnel).  Hernandez does not allege Defendants interfered with his medical or mental health treatment.  Notably, he does not allege that he filed sick call slips concerning his rash or feelings of depression that went unanswered or were not delivered to medical providers.

[16]     Hernandez's acknowledged ability to access the assistance of other inmates suggests he had interaction with others.

life's necessities, *Farmer*, 511 U.S. at 832,  so as to amount to an Eighth Amendment violation. To the contrary, Hernandez's placement on administrative segregation was prompted by an internal investigation which substantiated he was not safe in the general prison population at JCI. There is no evidence that the delay in effectuating the transfer was attributable to deliberate indifference or other impermissible animus by Defendants.[17]  No genuine issues of material fact are presented and Defendants are entitled to summary judgment as a matter of law.

## V.    Classification Reviews

Hernandez complains he did not understand his monthly administration segregation reviews, and on just one occasion had the services of a Spanish-speaking correctional officer to translate.  Hernandez does not allege a violation of a specific constitutional provision in this regard, and fails to set forth a cognizable claim for relief under § 1983.

According to Lt. Legrand, Hernandez never requested a translator for his segregation reviews.  On several occasions Legrand requested Sgt. Roman sit in on the review to translate. Case manager Allen does not recall Hernandez requesting a translator, although he recalls Sgt. Roman acted as an interpreter on several occasions.  Allen also states that, in the beginning, Hernandez did not have a communication problem with the review team.

Hernandez did not raise these concerns prior to January of 2014 when he first submitted an informal complaint to Peay.  It is clear, however, that the correctional staff was already aware

---

[17]        Of course, inmates have a liberty interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484; (1995); *Wilkinson v. Austin*, 545 U.S. 209 (2005); s*ee also Incumaa v. Stirling*, _ F.3d _, 2015 WL 3973822 (July 1, 2015) (applying the general prison population as a comparable baseline for atypicality).  In light of Hernandez's need to be housed for safety reasons pending transfer, thirty-day monthly reviews of his segregation, and Defendants' acknowledgement there was difficulty arranging transfer to an appropriate medium security facility, the circumstances do not suggest atypical and significant hardship giving rise to a due process violation. Although the conditions of confinement in administrative segregation are typically more burdensome than those imposed on the general prison population, Hernandez has provided no evidence that the conditions to which he was subjected were so atypical that exposure to them imposed a significant hardship in relation to the ordinary incidents of prison life.  *See Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (placement in segregation did not comparatively constitute the type of hardship necessary to give rise to a liberty interest).

of his desire to be transferred and placed in general population.   Regardless of Hernandez's ability to speak English, there is no dispute that correctional officials were aware of his need to be kept in administrative segregation for his safety until a suitable transfer to a medium security facility could be arranged.   (ECF No. 13-1, p. 21, asserting "even if Plaintiff spoke the king's English, this would not have changed the result [of the review hearings], because the correctional staff were seeking to keep him safe pending a transfer").   Accordingly, there are no genuine issues of material fact presented as to this claim and Defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the court will grant Defendants' Motion for Summary Judgment by separate Order to follow.[18]

  July 27, 2015
Date

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

---

[18]     In light of the foregoing, the court need not reach Defendants' qualified immunity defense.

21